# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jeffrey Lynn Martinson,

                     Plaintiff,

v.

Jeanne Leason, *et al.*,

                     Defendants.

Civ. No. 12-3028 (RHK/SER)
**MEMORANDUM OPINION AND ORDER**

---

Frederick J. Goetz, Goetz & Eckland P.A., Minneapolis, Minnesota, for Plaintiff.

Jamie L. Guderian, Patti J. Skoglund, Jardine Logan & O'Brien, PLLP, Lake Elmo, Minnesota, Jay Stassen, Dakota County Attorney's Office, Hastings, Minnesota, for Defendants.

---

## INTRODUCTION

In January 2011, Plaintiff Jeffrey Lynn Martinson arrived at the Dakota County Jail (the "Jail") to serve a one-year sentence for a probation violation. He alleges in this action that three Jail nurses, Defendants Jeanne Leason, Margaret Erbstoesser, and Laura Thurmes, were negligent[1] and deliberately indifferent to his serious medical needs, in violation of the United States Constitution, when they failed to treat an infection that progressed to sepsis[2] and ultimately required the amputation of nine of his fingers.

---

[1] Dakota County also is named as a Defendant, with respect to the negligence claim only.

[2] Sepsis is a "life-threating complication of an infection" occurring "when chemicals released into the bloodstream to fight the infection trigger inflammation throughout the body. This inflammation can trigger a cascade of changes that can damage multiple organ systems, causing

Presently before the Court is Defendants' Amended Motion for Summary Judgment (Doc. No. 41).  For the reasons that follow, the Court will grant the Motion in part, dismiss the deliberate-indifference claim, and decline to exercise supplemental jurisdiction over the negligence claim.

## BACKGROUND

Viewed in the light most favorable to Martinson, the record reveals the following pertinent facts.  Martinson was booked into the Jail on January 2, 2011.  He filled out an intake questionnaire denying any ongoing medical problems save for depression and high blood pressure, which were being treated through the Veterans Administration.  He continued to receive medications to treat these conditions from the Jail.

In mid to late February 2011, Martinson contracted what he believed to be a head cold, experiencing congestion, a scratchy throat, and a cough.  According to Martinson and others housed with him (James Bronsing and Willis Werner), upper respiratory infections were common among inmates around that time.[3]  Martinson mentioned his illness to a nurse at "med pass," during which nurses pass through the Jail with a cart to distribute medication.  Although it is not unusual for inmates to mention health issues

---

them to fail."  http://www.mayoclinic.org/diseasesconditions/sepsis/basics/definition/con-20031900 (last visited May 14, 2014).

[3] At oral argument, Martinson moved to strike (as hearsay) "statements" Bronsing and Werner provided in April 2012.  But the Court has not relied upon the statements; rather, it relies upon sworn Affidavits Bronsing and Werner submitted, on *Martinson's* behalf, in connection with the instant Motion.  (See Bronsing Aff. (Doc. No. 48) ¶ 7 ("I remember that a lot of people in our housing unit got sick that winter.  Jeff Martinson was the first one that I remember in our unit to come down with this illness.  After Jeff had it, a number of other people in the unit came down with what seemed to be the same thing[,] including me."); Werner Aff. (Doc. No. 52) ¶ 6 ("That winter and early spring in the jail there was some kind of virus going around.").)

during med pass, typically they are told to write a "kite," a written request for medical service. Kites generally are sent electronically to the Jail's nursing staff, through a kiosk located in each Jail housing unit, although forms exist on which an inmate can send a handwritten one. Martinson was familiar with the electronic kiting system, as he had been incarcerated in the Jail in 2010 and had used it at that time.

On Friday, March 4, 2011, Martinson submitted an electronic kite providing: "[I] talked to [a] Nurse [at med pass] and was told to kite for Tylenol morning and night. Came down with bad head cold and is giving me headaches. Thanks. She gave me one [tonight]." A nurse responded to this kite the following Monday morning, stating she had "put [him] down for Tylenol X 7 days." Martinson then received Tylenol at the evening med pass for each of the next seven days.[4]

The record is somewhat unclear whether Martinson's symptoms improved. On one hand, he wrote letters to his girlfriend (Lisa Hartwig) stating that he was getting better. On March 6, for example, he wrote that he "ended up with a darn head cold last week" but the "cold is going away fast." On March 21, he wrote that the cold had gotten "better, then worse," and was "now starting to get better again." In addition, records from the hospitals at which Martinson received treatment on April 9 (discussed in more detail below) indicate that when he arrived, he complained of a cough lasting only a short period of time. (See Goetz Aff. Ex. 9 ("has had cough for [a] few days"); id. Ex. 10 ("In jail with bloody cough x 4 days"); id. Ex. 11 ("[P]atient noted that fever, chills, cough,

---

[4] Martinson could have received Tylenol at the morning and afternoon med passes, but he was working in the Jail's kitchen at those times and was unable to obtain it.

sputum, hemoptysis and diarrhea all started Wed[nesday] and progressively worsened since.").) Yet on the other hand, inmates who were housed or worked with Martinson aver that his symptoms did not improve. Martinson, too, testified in his deposition that his cold steadily worsened and he repeatedly told nurses at med pass that he was not getting better, though he does not recall who he told or when. And he claims that because he was not improving, he sent a second, handwritten kite sometime in mid-March, indicating that his headaches and sore throat had gotten worse and that his chest hurt "tremendously" when he coughed.[5]

In any event, at approximately 7:30 p.m. on Wednesday, April 6, 2011, Martinson sent another electronic kite as follows: "Need some antibiotics for myself. I have a viral infection in my head, ears are plugged and so are sinuses. Giving me migraines. Thanks. Have had for 3 weeks now." Defendant Leason responded 28 minutes later, after reviewing Martinson's chart, stating "[y]ou don't take antibiotics for viruses. You have a cold. We can give you Sudafed PE one tab 3 times a day for 7 days." She did not physically assess him at that time.

The following day, Thursday, April 7, Martinson reported to his job in the Jail kitchen but felt significantly more ill and left early. When he returned to his cell, he began having bouts of diarrhea in addition to his "severe" cough, which was producing

---

[5] For purposes of the instant Motion, the Court accepts as true Martinson's deposition testimony that he submitted a handwritten kite in mid-March. No copy of this kite was found in his medical chart at the Jail, however. Moreover, Martinson offered no explanation why he did not submit this kite electronically, as he did for *all* his other requests for medical care, and in fact he originally maintained that he *had* submitted the kite electronically, only to change that assertion after a defense witness testified that electronic kites cannot be deleted (meaning the absence of the kite from his records suggested that no electronic kite had been sent).

bloody sputum.  Nevertheless, he did not submit an additional kite and he made it to

evening med pass to receive Sudafed from Leason (who was distributing medications).

What happened during their encounter is in dispute.  Leason testified in her deposition

that Martinson was "in a good mood" and "came out smiling."  She asked how he was

feeling (as she had answered his kite the day prior) and he did not complain of a cough;

in addition, his color was good and he was not short of breath.  According to Leason,

Martinson only mentioned that he felt pressure in his sinuses, and she told him the

Sudafed would help.  For his part, Martinson first testified in his deposition that he did

*not* report the diarrhea or bloody cough to Leason, but later reversed course and testified

that he had, in fact, complained of those symptoms.  He also contends he specifically

asked Leason to arrange for him to see a doctor, although his deposition testimony on that

issue is somewhat opaque.[6]  Regardless, Leason provided no further assessment or

treatment, and Martinson returned to his cell.

Martinson remained in bed the following day, Friday, April 8, continuing to suffer

diarrhea and a bloody, painful cough that "felt like [his] insides were going to come up."

In addition, he vomited several times during the day.  At 8:13 p.m., he sent another

electronic kite:  "Need drugs to get rid of what I have.  Spent [the] afternoon throwing up

6 or 7 times and also the runs.  Kited last Wednesday but haven't seen a doctor.  I [work]

in the kitchen.  Also have a fever."  Approximately 45 minutes later, Defendant

Erbstoesser went to Martinson's cell to assess him.  She took his temperature (101°),

---

[6] Martinson cites pages 169-70 of his deposition transcript to support this assertion, but the cited pages indicate that while he repeatedly asked to see a doctor, he *could not recall* which nurses he had asked or when.

blood pressure (114/73), and pulse (102), and wrote in his chart that he was "seen for nausea, vomiting and diarrhea."[7]  Only the elevated temperature concerned Erbstoesser, as Martinson's other vital signs were with a "normal" range or very close to it.  Given the rapid onset of vomiting and diarrhea, she believed he was suffering from gastroenteritis (stomach flu).  Accordingly, she ordered him moved to an isolation cell in the Jail's intake area, both to prevent transmission to other inmates and because isolation cells have small windows from which Jail deputies check on inmates every thirty minutes while performing "rounds."  The cells also contain an emergency button that can be pressed by inmates for medical problems.  In addition, Erbstoesser directed the administration of Tylenol, put Martinson on a clear liquid diet, and issued a Nursing Order to the nurse on duty the following day to check his vital signs at least three times.  As her shift ended at approximately 11:00 p.m. on April 8, she observed Martinson "sleeping, resting comfortably" through his cell window, and she then left for the evening.  Guards performing rounds overnight observed nothing amiss.

Defendant Thurmes worked the following day, April 9.  She took Martinson's vital signs at approximately 9:30 a.m., noting an increased pulse rate and decreased blood pressure.  She recorded the following in his chart:  "Seen inmate[,] head congestion noted.  Temp 102.5.  Tylenol given.  Feels weak [encouraged] fluids[,] will check on him again in a little.  Instructed if feels worse or different to call."  Martinson also was given Sudafed for head congestion.  Over the subsequent hours, he did not activate the

---

[7] Martinson claims he also told Erbstoesser about his bloody cough and chest pain; he did not mention these symptoms in his kite, however, and Erbstoesser denies any such report.

emergency call button in his cell, and deputies performing rounds noted nothing out of the ordinary.  At approximately 2:00 p.m., Thurmes again assessed Martinson and took his vital signs.  His symptoms were largely unchanged, although his fever had dropped to 99.5°.  She entered the following note in his chart:  "Temp 99.5.  Congested.  States he[] can't keep [any]thing down[,] Gatorade given.  If continues may need to send in," referring to possibly sending Martinson to the emergency room.  Thurmes's shift ended at 3:30 p.m., at which point she left the Jail.

At approximately 5:35 p.m. on April 9, Martinson pushed the emergency button in his cell.  A Jail deputy arrived quickly; Martinson complained he was having difficulty breathing.  The deputy noted that Martinson was struggling to catch his breath and immediately started him on oxygen, then had him transported to the emergency room at Regina Hospital in Hastings, Minnesota, a short distance away.  He arrived at 5:54 p.m., complaining of shortness of breath that "came on suddenly," fever, nausea, and diarrhea; his temperature on arrival was 99.2°.  Bloodwork revealed an elevated white blood cell count, but a chest X-Ray was negative for pneumonia, leaving the ER doctors unsure what was causing his symptoms.  Approximately two hours after arrival, however, Martinson's temperature spiked to 104.3°.  Concerned that he might be suffering from a pulmonary embolism, he was transferred to Regions Hospital in St. Paul.  No doctor at Regina diagnosed sepsis.

Doctors at Regions also were unable to quickly determine the cause of Martinson's symptoms.  (See, e.g., Goetz Aff. Ex. 11 at 38 ("Etiology unclear at this time: pneumonia, gastroenteritis, UTI are on differential [diagnosis].").)  Chest X-Rays

continued to return negative for pneumonia, and an ER doctor noted that he "appear[ed] more septic than anything." At approximately 8:51 p.m. on April 9, Martinson was finally started on intravenous antibiotics and vasopressors[8] for sepsis from a "possible pulmonary source." Despite this treatment, his condition deteriorated and he became disoriented, leading doctors to put him into a medically induced coma. Within a few days, his medical team noticed reduced blood flow in his hands, a potential side effect of both sepsis and vasopressor use, and his finger tissue turned necrotic. Ultimately, all fingers on his left hand had to be completely amputated and four fingers on his right hand (all but the thumb) had to be partially amputated.

Martinson commenced this action in December 2012 against Leason, Erbstoesser, and Thurmes (the "Individual Defendants"), in both their official and individual capacities, as well as Dakota County; he later amended his Complaint twice. The two-count Second Amended Complaint alleges that (1) the Individual Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution, and (2) Defendants rendered negligent care and treatment to him.[9] With discovery complete, Defendants now move for summary judgment. Their Motion has been fully briefed, the Court heard argument on April 30, 2014, and the Motion is ripe for disposition.

---

[8] A vasopressor is a medicine that raises blood pressure.

[9] Martinson also alleged a "claim" for punitive damages, but punitive damages are a type of remedy, not an independent cause of action. E.g., Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran, 604 F. Supp. 2d 22, 25 (D.D.C. 2009).

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The movant bears the burden of showing the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

### I.    The constitutional claim

The Individual Defendants[10] argue they are entitled to qualified immunity on Martinson's deliberate-indifference claim.  In analyzing that assertion, the Court must

---

[10] The Individual Defendants have been sued in both their official and individual capacities under 42 U.S.C. § 1983.  But official-capacity claims against government officials are the functional equivalent of claims against the municipal entity in question (here, Dakota County), see, e.g., Rogers v. City of Little Rock, Ark., 152 F.3d 790, 800 (8th Cir. 1998), and Martinson has conceded he "has no § 1983 claim against Dakota County" (Mem. in Opp'n at 32 n.2).  Hence,

answer two questions:  (1) Do the facts alleged, when viewed in the light most favorable to Martinson, show that the challenged conduct violated a constitutional right?  (2) If a violation could be established based on those facts, was the constitutional right at issue clearly established on the date in question?  See, e.g., Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004).

The constitutional right at issue here is the right to be free from cruel and unusual punishment under the Eighth Amendment.  There is no dispute it was clearly established in 2012 that "deliberate indifference" to a prisoner's serious medical needs violates the Eighth Amendment.  See, e.g., Estelle v. Gamble, 429 U.S. 97, 104 (1976); Vaughn v. Greene Cnty., Ark., 438 F.3d 845, 850 (8th Cir. 2006).  The question, then, is whether the record creates a genuine issue that the Individual Defendants' conduct violated that right.

"Deliberate indifference has both an objective and a subjective component." Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006).  The objective component requires the plaintiff to show he was suffering from an objectively serious medical need.  E.g., Grayson v. Ross, 454 F.3d 802, 808 (8th Cir. 2006); Moore v. Jackson, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam).  The subjective component requires the plaintiff to show the defendant actually knew of, but disregarded, that need.  E.g., Krout v. Goemmer, 583 F.3d 557, 568 (8th Cir. 2009); Grayson, 454 F.3d at 808-09.  The plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional

---

he also "has no § 1983 claim" against the Individual Defendants in their official capacities.  The analysis that follows, therefore, concerns only Martinson's individual-capacity claims.

violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." <u>Popoalii v. Corr. Med. Servs.</u>, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).  This is an "onerous standard," <u>Thompson v. King</u>, 730 F.3d 742, 747 (8th Cir. 2013), requiring a prisoner to "clear a substantial evidentiary threshold," <u>Nelson v. Shuffman</u>, 603 F.3d 439, 449 (8th Cir. 2010).  Moreover, because "[l]iability for damages for a federal constitutional tort is personal, . . . each defendant's conduct must be independently assessed." <u>Heartland Acad. Cmty. Church v. Waddle</u>, 595 F.3d 798, 805-06 (8th Cir. 2010).

### A.    Erbstoesser and Thurmes

The Court begins its analysis with Erbstoesser and Thurmes, the last two nurses to interact with Martinson (on April 8 and 9).  The Court has little trouble concluding that neither was deliberately indifferent to his medical needs.

Erbstoesser first encountered Martinson when she received his kite at approximately 8:15 p.m. on April 8.  It is undisputed she responded 45 minutes later, traveling to Martinson's cell and taking his vital signs, all of which were near normal save for his elevated temperature.  She believed he was suffering from gastroenteritis, given the rapid onset of vomiting and diarrhea, and she had him moved to an intake cell where he could be easily monitored.  She also prescribed a clear liquid diet, ordered the administration of Tylenol for his fever, and directed the following day's nursing staff to check his vital signs at least three times.  Before ending her shift for the evening, she looked in on Martinson and observed him sleeping comfortably in his cell.  Similarly, Thurmes assessed Martinson early in the morning of April 9.  It is undisputed she took

-11-

his vital signs, gave him Tylenol and Sudafed, and offered him fluids, and she informed

him she would check him again later that day and that he should push the emergency call

button if he felt worse.  Martinson did not push the button before Thurmes assessed him

again at approximately 2:00 p.m.  She noted his symptoms were largely unchanged,

though his fever had dropped.  She gave him Gatorade in response to his complaint that

he could not keep anything down, and she noted she was considering sending him to the

emergency room if his symptoms persisted.

Based on these undisputed facts, and assuming *arguendo* Martinson was suffering

from a serious medical need when he encountered the nurses on April 8 and 9, in the

Court's view their conduct simply was not that of health professionals acting with

deliberate indifference.  This was not a situation in which the nurses "ignor[ed] the

detainee."  Krout, 583 F.3d at 569.  Rather, Erbstoesser assessed Martinson's condition

and took steps to address what she believed the problem to be (gastroenteritis).  Thurmes,

too, evaluated him and, when his symptoms were not improving, considered sending him

to the emergency room.  Each administered medicine and fluids, Erbstoesser had

Martinson moved to a cell where he could be more easily monitored and could call for

help if needed, and Thurmes encouraged him to push the emergency call button if he felt

worse.  All of these facts are undisputed and belie the suggestion the nurses "closed their

eyes to the obvious."  (Mem. in Opp'n at 43.)

Martinson argues he has proffered evidence from which a jury could conclude

Erbstoesser and Thurmes "provid[ed] care that was so grossly incompetent or inadequate

as to amount to no care at all."  (Id. at 42.)  True, the Eighth Circuit has recognized that

"[g]rossly incompetent or inadequate care can . . . constitute deliberate indifference."

Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010) (quoting Smith v. Jenkins, 919

F.2d 90, 93 (8th Cir. 1990)).  Yet, it has also recognized that gross negligence will not

suffice, see, e.g., Thompson, 730 F.3d at 747; Langford, 614 F.3d at 460, which is

consistent with teachings from the Supreme Court, see, e.g., Minneci v. Pollard, __ U.S.

__, 132 S. Ct. 617, 625 (2012) (deliberate indifference requires "that a defendant act[] not

just negligently"); Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate

indifference describes a state of mind more blameworthy than negligence.").  Our Court

of Appeals has offered no clear demarcation between "grossly incompetent" care

crossing the deliberate-indifference line and "grossly negligent" care falling short of it.

Yet, the few cases holding "grossly incompetent" care sufficient involved facts that were,

in this Court's view, more egregious than those at issue here.  See, e.g., Langford, 614

F.3d at 450-51 (ongoing severe stomach pain and vomiting blood for which plaintiff

repeatedly complained and submitted grievances, but was given only antacid tablets);

Warren v. Fanning, 950 F.2d 1370, 1373 (8th Cir. 1991) (complaints of foot pain over 14

months and black toenails treated with "patient reassurance").  Simply put, "[g]rossly

incompetent or inadequate care" will suffice only if "so inappropriate as to evidence

intentional maltreatment or a refusal to provide essential care."  Dulany v. Carnahan, 132

F.3d 1234, 1242 (8th Cir. 1997) (citation omitted).  In the Court's view, that label does

not apply to the treatment rendered by Erbstoesser and Thurmes.

Martinson also offers the nurses' (alleged) violation of the Jail's "cold protocol" as

evidence of deliberate indifference.  (See Mem. in Opp'n at 41.)  The protocol provides

that after five days of upper-respiratory symptoms, a nurse should "[c]onsider a medical visit" for an inmate.  But the protocol does not mandate a nurse send an inmate to a doctor; rather, it only requires a nurse to *consider* it.  And, it is undisputed that Thurmes, at least, did consider having Martinson brought to the emergency room.

Moreover, though Martinson (allegedly) informed Erbstoesser and Thurmes about his ongoing cold symptoms, his complaints on April 8 and 9 focused on fever, vomiting, and diarrhea; indeed, his April 8 kite nowhere mentioned a cough or chest pain.  Hence, the alleged "violation" of the protocol appears to be something less than deliberate.  But Martinson must show more – acting "unreasonably in failing to take particular measures" does not suffice, because "'reasonableness is a negligence standard,' and 'negligence cannot give rise to a deliberate indifference claim.'"  Krout, 583 F.3d at 567 (citations omitted); accord, e.g., Thompson, 730 F.3d at 747.  Indeed, summary judgment would be appropriate even if the evidence revealed Erbstoesser and Thurmes "should have known they were committing malpractice."  Fourte v. Faulkner Cnty., Ark., 746 F.3d 384, 389 (8th Cir. 2014).  While perhaps the nurses should have understood cold symptoms combined with fever and nausea as evidencing a more serious problem than stomach flu, "[a]n official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot . . . be condemned under the Eighth Amendment."  Farmer, 511 U.S. at 838.[11]

---

[11] Indeed, the Court finds it noteworthy that at the hospital, Martinson's doctors could not readily determine what was wrong with him and even recognized, as Erbstoesser had, that he might have been suffering from gastroenteritis.  (See Goetz Aff. Ex. 11 at 38 ("Etiology unclear at this time: pneumonia, gastroenteritis, UTI are on differential [diagnosis].").)  And although Martinson has

Simply put, courts "hesitate to find an [E]ighth [A]mendment violation when a prison inmate has received medical care." Smith, 919 F.2d at 93. On the facts presented here, the Court concludes that while Martinson may not have received *perfect* care from Erbstoesser and Thurmes, the care he received was constitutionally sufficient. See, e.g., Hudson v. McMillian, 503 U.S. 1, 9 (1992) (Eighth Amendment does not require that prisoners receive "unqualified access to health care"); Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991) ("[I]t is not constitutionally required that" care be "perfect, the best obtainable, or even very good.") (citation omitted); Schaub v. VonWald, 638 F.3d 905, 935 (8th Cir. 2011) (Beam, J., dissenting) ("[I]nmates are only entitled to adequate medical care, not the best care possible.") (internal quotation marks and citation omitted). Accordingly, they are entitled to qualified immunity.

**B.     Leason**

Although the analysis differs somewhat with respect to Leason, the end result is the same:  the record fails to create a genuine issue that she was deliberately indifferent to a serious medical need.

**1.     An objectively serious medical need?**

In order to overcome Defendants' Motion, Martinson must show he presented to Leason with an objectively serious medical need – one that either had been diagnosed by a physician as requiring treatment or that was so obvious even a layperson would have

---

submitted Affidavits from two doctors and a corrections nurse indicating they would have responded differently to his symptoms, "[s]howing that another . . . might have ordered different tests and treatment does not show deliberate indifference." Dulany, 132 F.3d at 1242. Were it otherwise, all cases in which a plaintiff obtained an after-the-fact medical opinion that he received inadequate care would survive summary judgment. This is not the law. See id.

easily recognized the necessity for a doctor's attention.  E.g., Jones v. Minn. Dept. of Corr., 512 F.3d 478, 481 (8th Cir. 2008).  Leason had two encounters with Martinson, both of which occurred before he became more symptomatic and presented to Erbstoesser and Thurmes on April 8 and 9.  As no physician had diagnosed him with a condition requiring treatment on April 6 or 7, he must create a genuine issue using "obviousness."  The Court harbors serious doubts whether he has done so.

In their first interaction, Leason received and reviewed Martinson's April 6 kite, in which he wrote, "Need some antibiotics for myself.  I have a viral infection in my head, ears are plugged and so are sinuses.  Giving me migraines.  Thanks.  Have had for 3 weeks now."  In other words, he reported symptoms consistent with a (lengthy) cold or upper-respiratory infection; notably, he made no mention of fever, cough, blood-tinged sputum, or shortness of breath.  Courts have concluded that inmates manifesting cold symptoms were not suffering from objectively serious medical needs.  See, e.g., Vasquez v. Baca, 323 F. App'x 503, 504 (9th Cir. 2009) (plaintiff's "allegations concerning treatment of a cold [and] a migraine . . . did not implicate a serious medical need"); Gibson v. McEvers, 631 F.2d 95, 98 (7th Cir. 1980) (a cold is not a serious medical need); Brunson v. Beasley, No. 7:08-CV-132, 2009 WL 44704, at *2 (M.D. Ga. Jan. 5, 2009) (same); Fulks v. Otwell, No. 4:07-cv-4010, 2008 WL 2949550, at *4 (W.D. Ark. July 30, 2008) (same); Liggins v. Barnett, No. 4-00-CV-90080, 2001 WL 737551, at *6 (S.D. Iowa May 15, 2001) (Report & Recommendation of Bremer, M.J.) (finding "no case in which a plaintiff suffering from flu-like symptoms . . . has been held to have had a serious medical need"), adopted in relevant part, No. 4-00-CV-90080, slip op. at 2 (S.D.

Iowa Sept. 5, 2011); Schwartz v. Jones, No. 99-3269, 2000 WL 1859012, at *3 (E.D. La. Dec. 18, 2000) (head cold and "flu-like symptoms" were "not serious medical needs.").

To be sure, Leason testified that she reviewed Martinson's prior kites before responding on April 6, and he claims he submitted a handwritten kite in mid-March complaining of a cough with "tremendous" chest pain.  Hence, evidence exists from which it can be inferred Martinson formerly complained he was suffering from these symptoms and Leason was aware of it.  But critically, cough and chest pain were *not* mentioned in the April 6 kite itself, and deliberate indifference is "measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'"  Schaub, 638 F.3d at 915 (quoting Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir.1998)).  The absence of complaints about cough or chest pain on April 6 undermines the existence of an objectively serious medical need on that date.  See Neu v. Cnty. of Benton, Civ. No. 06-601, 2007 WL 2454127, at *5-6 (D. Minn. Aug. 23, 2007) (Frank, J., adopting Report & Recommendation of Mayeron, M.J.) (holding that plaintiff suffered no objectively serious medical need because, *inter alia*, he never submitted a medical request form).

Furthermore, Martinson and other inmates have testified that upper-respiratory infections were rampant at the Jail during the period in question.[12]  Whether a medical need is sufficiently obvious "cannot be analyzed in a vacuum.  The prison officials' background knowledge is part of the analysis." Jones, 512 F.3d at 482.  In other words, context is everything.  And here, even if the Court assumes Martinson complained of a

---

[12] That the other inmates have opined it was obvious Martinson needed to see a doctor is not dispositive.  See, e.g., Carpenter v. Gage, 686 F.3d 644, 650 (8th Cir. 2012) (need for medical treatment not obvious despite officer being told plaintiff was suffering a stroke).

lengthy cough – with or without chest pain – prior to April 6, context suggests his condition was not objectively serious as of that date, given the frequency with which inmates were suffering from colds and his failure to complain of a cough or chest pain in his kite.  See id. (no serious medical need suffered by plaintiff who "was unable to stand or walk under her own power, was 'google-eyed' and unresponsive, was rolling on the ground while grunting and groaning, was bleeding from the mouth, smelled as if she had urinated on herself, and was breathing at a very rapid rate," where she became "violently sick and uncooperative . . . only upon learning of her transfer to" another prison and was "able to move around and partake in day-to-day activities before hearing of the transfer"); Neu, 2007 WL 2454127, at *5-6.

In their second interaction, Leason encountered Martinson at med pass on April 7. By that point, he had begun suffering from diarrhea and his cough had worsened, although the record is unclear whether he conveyed these symptoms to Leason.[13]  But assuming *arguendo* he did, in fact, report diarrhea and a bloody cough on top of cold symptoms, it is questionable whether these additional symptoms would elevate his maladies into an objectively serious medical need.  Indeed, Leason testified in her deposition that Martinson was neither short of breath nor complained of being so, and his color was good.  She also testified that he did not complain of chest pain.  All of this testimony is undisputed.  Furthermore, *none* of Martinson's expert witnesses have opined

---

[13] Notably, none of Martinson's experts has included in his Affidavit any discussion of cough, chest pain, or bloody sputum as of April 7, despite an otherwise lengthy recitation of Martinson's history and medical complaints; as discussed below, the experts instead focus on April 8 and 9, when Martinson encountered Erbstoesser and Thurmes.

that diarrhea, cough, bloody sputum, or any of the other symptoms he was allegedly

manifesting on April 7, whether viewed individually or in combination, suggest he was

suffering from an objectively serious medical need.

Jones is instructive.  There, the plaintiff was confined at a state prison after being

transferred from a county jail.  When she arrived, she did not respond to commands to

exit the transfer vehicle, "mumbling and exhibiting a blank stare."  512 F.3d at 479.

Officers then physically removed her, noting she had "an unpleasant odor, like urine or

body odor."  Id.  Once outside the vehicle, she sat down on the floor, mumbled, grunted,

rolled around, and did not comply with directions to stand.  A "pressure-point technique"

elicited no response.  Officers described her breathing as "heavy," "labored," and "fast

paced."  Id. at 480.  She was eventually lifted into a wheelchair and taken to an intake

screening, but she did not answer the intake nurse's questions.  Her pulse (normal) and

respiration (three times faster than normal) were taken, and the nurse noted that Jones

appeared "'uncomfortable,' grunting, with dried blood on her mouth and lips."  Id.  She

was later moved to a cell, where corrections officers heard her moaning and observed that

her eyes appeared "strange and were darting back and forth."  Id.  Officers later found her

unresponsive, and she was pronounced dead a short time later, with an autopsy revealing

she died of pulmonary edema (fluid in the lungs).  Id.

Jones's next-of-kin commenced an action against several jail officers and the

intake nurse, alleging they had been deliberately indifferent.  The undersigned granted

summary judgment to the defendants based on qualified immunity, determining *inter alia*

that Jones was not suffering from an objectively serious medical need, see Civ. No. 05-

1249, 2006 WL 3102984, at *6-8 (D. Minn. Oct. 31, 2006), and the Eighth Circuit

affirmed, concluding that the symptoms recounted above did not constitute "a sufficiently

obvious medical issue." 512 F.3d at 482. If the symptoms present in <u>Jones</u> were

insufficient to show an obvious medical need, then it is doubtful the symptoms with

which Martinson presented to Leason on April 7 would suffice.

### 2.   Verifying medical evidence

Regardless, the Court need not determine whether Martinson presented to Leason

with an objectively serious medical need on either April 6 or April 7, because his claim

fails for another reason. Where, as here, an inmate alleges that "a delay in medical

treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness

of the deprivation should also be measured by reference to the *effect* of delay in

treatment.'" <u>Laughlin v. Schriro</u>, 430 F.3d 927, 929 (8th Cir. 2005) (citation omitted).

To establish this effect, "the inmate 'must place verifying medical evidence in the record

to establish the detrimental effect of [the] delay.'" <u>Id.</u> (quoting <u>Crowley v. Hedgepeth</u>,

109 F.3d 500, 502 (8th Cir. 1997)). No such "verifying medical evidence" exists here.

As noted above, Martinson's medical experts focus their attention on Erbstoesser

and Thurmes; they make scant mention of Leason or the symptoms with which Martinson

allegedly presented to her on April 6 and 7. The most Martinson offers is the Affidavit of

Dr. James Miner, an emergency-medicine physician retained to "render opinions as to

whether, if [] Martinson had presented to an emergency room [earlier] and received the

care I believe he would have received, would he more likely than not had a better

outcome." (Miner Aff. ¶ 1.) Dr. Miner recites the symptoms Martinson (allegedly)

manifested on April 6[14] and simply opines that "[g]iven these symptoms and history, had he presented to an emergency room[,] he would and should have received a thorough medical examination including a complete physical examination and labs including obtaining a white blood cell count." (Id. ¶ 11(a)(ii).)  Yet, Dr. Miner offers *no* opinion what treatment should have been provided at that juncture or, more importantly, the *effect of failing to receive that treatment*.  This stands in stark contrast to the opinions he offers with respect to Erbstoesser and Thurmes.  For example, he notes that had Martinson received appropriate treatment from Erbstoesser on April 8, he would have received antibiotics and intravenous fluids, which "would have prevented the onset of severe sepsis and associated hypovolemia with resultant end organ damage and ischemia." (Id. ¶ 11(b)(iii).)  Similarly, Dr. Miner opines that had Thurmes sent Martinson to the emergency room earlier on April 9, he would have received fluids and antibiotics, which "would have prevented the progression of his sepsis and . . . resultant end organ damage and ischemia." (Id. ¶ 11(c)(iii).)  No similar opinions are offered with respect to Leason.

As in Laughlin, this dooms Martinson's claim.  There, the plaintiff had complained to jail guards that he was suffering a heart attack and, after some delay, was transferred to a medical unit, examined by a physician, prescribed an antacid tablet, and returned to his cell.  430 F.3d at 928.  Several hours later he again summoned medical assistance and was transported to the hospital, where he was "diagnosed as having suffered a small acute myocardial infarction," *i.e.*, a heart attack, requiring an angioplasty.  Id.  When the plaintiff brought a deliberate indifference claim against the

---

[14] Dr. Miner does not discuss April 7.

guards, the district court dismissed and the Eighth Circuit affirmed, because "[w]hile Laughlin submitted evidence documenting his diagnosis and treatment, he offered no evidence establishing that any delay in treatment had a detrimental effect and thus failed to raise a genuine issue of fact on an essential element of his claim." Id. at 939; accord, e.g., Dulany, 132 F.3d at 1243 (affirming dismissal of deliberate-indifference claim where plaintiff offered no medical evidence showing delay in treatment of cardiac condition adversely affected her prognosis).  The same is true in this case.

In sum, Martinson has failed to create a triable issue whether Leason was deliberately indifferent to an objectively serious medical need.  She is entitled to qualified immunity.

## II.    The negligence claim

The Court's subject-matter jurisdiction in this action is premised on the existence of a federal claim – namely, the deliberate-indifference claim.  (See Second Am. Compl. ¶ 9.)  Jurisdiction over the negligence claim exists solely by virtue of the supplemental-jurisdiction statute, 28 U.S.C. § 1367, which provides jurisdiction over state-law claims forming part of the same "case or controversy" as federal claims.  But the exercise of supplemental jurisdiction is discretionary, and where all federal claims have been dismissed prior to trial, the factors to be considered in deciding whether to exercise such jurisdiction – judicial economy, convenience, fairness, comity, and predominance of state issues – typically militate against doing so.  E.g., Johnson v. City of Shorewood, Minn., 360 F.3d 810, 819 (8th Cir. 2004) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)); accord, e.g., United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)

("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). That is the case here. Accordingly, the Court declines to exercise supplemental jurisdiction over Martinson's negligence claim, and it will dismiss that claim without prejudice.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is **ORDERED** that Defendants' Amended Motion for Summary Judgment (Doc. No. 41) is **GRANTED IN PART**, and Martinson's federal claim (Count I of the Second Amended Complaint) is **DISMISSED WITH PREJUDICE**. The Court declines to exercise supplemental jurisdiction over Martinson's negligence claim (Count II of the Second Amended Complaint), which is **DISMISSED WITHOUT PREJUDICE**.[15]

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  May 21, 2014                                     s/Richard H. Kyle
                                                        RICHARD H. KYLE
                                                        United States District Judge

---

[15] Title 28 U.S.C. § 1367(d) provides that "[t]he period of limitations for any claim asserted under" the supplemental-jurisdiction statute "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."